**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **U.S. BORAX INC.,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO. 19-cv-01661-MAK** |
| **v.** | : | |
| | : | |
| **MARK ZAMEK,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## SECOND AMENDED COMPLAINT

Plaintiff U.S. Borax Inc. ("Borax"), by its undersigned attorneys, hereby brings the following Second Amended Complaint against Defendant Mark Zamek ("Zamek"). In support, Borax avers as follows:

## INTRODUCTION

1.     In the several months leading up to his departure from Borax, and while he was negotiating a job offer with Borax's main competitor, Etimine USA, Inc. ("Etimine"), Zamek downloaded hundreds of confidential documents from Borax's computer systems onto two USB drives, and took one of those USB drives with him upon his departure. Zamek also forwarded or attempted to forward emails from his Borax email account to his personal email account and set up an auto-forward from his Borax email to his personal email. Shortly after his Borax employment ended, Zamek began working for Etimine. In accordance with a confidentiality agreement that Zamek signed upon the commencement of his employment and his severance agreement signed in January 2019, he promised to return or destroy and not to use or disclose any of Borax's confidential information after the termination of his employment. However, Mr. Zamek, at a minimum, uploaded several confidential Borax documents to his Etimine computer.

Later, in response to inquiries from Borax, Zamek insisted he had done no wrong but repeatedly refused to sign a declaration confirming that he was complying with the confidentiality agreement and had deleted all Borax confidential information in his possession and that he had not used or disclosed any Borax confidential information.

2.      Borax commences this action seeking preliminary and permanent injunctive relief and damages due to Zamek's wrongful (1) breach of his confidentiality agreement; (2) breach of his severance agreement; (3) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; (4) misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S.A. § 5301, *et seq*.; (5) conversion; (6) breach of the fiduciary duty of loyalty; and (7) interference with existing contractual relationship.

## JURISDICTION AND VENUE

3.      Jurisdiction is appropriate in this matter under 28 U.S.C. § 1331, as it is an action arising under the laws of the United States.

4.      Jurisdiction is appropriate in this matter under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and is between citizens of different states.

5.      Venue is appropriate in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because the alleged harm and breach occurred, and continues to occur in this District, and Zamek lives in this District.

## THE PARTIES

6.      Borax is incorporated in Delaware.  Borax's headquarters and principal place of business are in Boron, California.  Borax is not a citizen of the Commonwealth of Pennsylvania.

7.      Zamek lives in Allentown, Pennsylvania.  He is a citizen of the Commonwealth of Pennsylvania.

## ZAMEK'S EMPLOYMENT WITH BORAX
## AND CONFIDENTIALITY OBLIGATIONS

8.      Borax is a global leader in the supply and science of borates—naturally-occurring minerals containing boron and other elements.

9.      Borax mines, refines, and transforms borates into products for its customers.

10.     Zamek worked for Borax as a Regional Sales Manager beginning on May 22, 2000.

11.     To perform his job duties, Zamek had access to and was entrusted with Borax's trade secrets and confidential and proprietary information, including but not limited to, pricing information, supply chain costs, profit margins, business strategies, current and historical sales volumes, customer contract terms, and sales and pricing forecasting data for the entire Borax business.

12.     Further, during his employment, Zamek had access to pricing, cost of goods sold, profit margins, forecasting and confidential strategy information about Borax's largest global customers.

13.     This confidential, proprietary, and trade secret information has significant economic value to Borax and is, or would be, of significant economic value to competitors in the industry.

14.     Accordingly, Borax takes reasonable measures to maintain the secrecy of its confidential, proprietary, and trade secret information, including, but not limited to, requiring employees like Zamek to sign a confidentiality agreement upon commencement of their employment, equipping Borax-owned computer systems with password protection, requiring employees to acknowledge a confidentiality notice when signing on to Borax-owned computers, requiring employees to undergo training about confidentiality, as well as promulgating policies and procedures for accessing, transmitting, storing, generating and/or handling such information.

15.     One such measure that Borax takes to protect its confidential, proprietary and trade secret information—and in furtherance of its legitimate business interests—is that it requires all employees with access to that type of information, to agree to maintain the confidentiality of the information as a condition of their employment.

16.     On May 23, 2000, Zamek entered into such an agreement with Borax titled "Agreement Regarding Confidential Information, Inventions and Intellectual Property" ("Confidentiality Agreement").  A true and correct copy of the Confidentiality Agreement is attached hereto as Exhibit 1.

17.     In signing the Confidentiality Agreement, Zamek agreed that "[he would] not, without the Company's prior written permission, disclose to anyone outside of the Company or use in other than the Company's business, whether during or after [his] employment, any information or material of the Company, or any information or material received in confidence

from third parties by the Company, which is deemed by the Company in its sole discretion to be confidential." *See* Exhibit 1 at ¶ 2.

18.     Further, in the Confidentiality Agreement, Zamek agreed that if he left Borax, he would "return all property of the Company in [his] possession, including all confidential information or material such as drawings, notebooks, customer lists, reports and other documents, as well as any copies of the same." *See* Exhibit 1 at ¶ 2.

19.     Under the Confidentiality Agreement, the Company may deem confidential "any information or material which has not been made available generally to the public and was or is: (a) generated or collected by or utilized in the operations of the Company and which related to the actual or anticipated business or research and development of the Company;  or (b) suggested by or resulting from any task assigned to [the employee signing the agreement] or work performed by [the employee signing the agreement] for or on behalf of the Company." *See* Exhibit 1 at ¶ 2.

20.     After Borax filed its original Complaint in this matter, Zamek admitted in deposition testimony that he fully understood his obligations under the Confidentiality Agreement.

21.     On or about September 11, 2018, Zamek was notified that his last day of employment with Borax would be January 2, 2019.

22.     On January 2, 2019, Zamek signed a Separation and Release of Claims Agreement ("Severance Agreement"), which provided him with a $171,234.74 severance

payment along with other benefits.  A true and correct copy of the Severance Agreement is attached hereto as Exhibit 2.

23.     The Severance  Agreement expressly stated that the prior Confidentiality Agreement that Zamek had with Borax remained in full force and effect.  *See* Exhibit 2 at ¶5(b)

24.     The Severance Agreement also contained a confidentiality provision.  *See Id.* at ¶5.

25.     In signing the Severance Agreement, Zamek agreed "that all information which [he] may now possess, may obtain in the course of and prior to, during, or after his separation from employment, or may create prior to the end of his employment, or otherwise relating to any current or former employment or to the business of Employer or its Related Parties as conducted or obtained by the Employee on or prior to the date of termination ("Confidential Information"), shall not be published, disclosed, or made accessible to any other person, either before or after the effective date of Employee's employment separation.  Employee shall return all tangible evidence of such [confidential] information to [his] leader on or before the Separation date."  *See Id.* at ¶5(b).

26.     After Borax filed its original Complaint in this matter, Zamek admitted at his deposition that he understood that pursuant to the Severance Agreement, he could not use, communicate, or disclose any Borax non-public information after his employment with Borax ended and that he was required to return all Borax computers, digital storage devices, and documents that he had on any computer.

27.     The Severance Agreement states:  "[i]n the event Employee breaches any provision of this Agreement, Employee acknowledges that Employer shall have the right to pursue any and all available legal and equitable remedies against Employee, including but not limited to injunctive relief to enforce this Agreement.  In the event of any litigation to enforce the terms of this Agreement, the non-prevailing party will be responsible for paying the reasonable costs and attorney's fees incurred by the prevailing part in the pursuit of such a suit."  *See Id.* at ¶9.

## ZAMEK'S STEALING, USE, AND DISCLOSURE OF CONFIDENTIAL BORAX INFORMATION

28.     Zamek downloaded, otherwise took and failed to return Borax confidential documents for improper purposes after learning his employment would be terminated.  Zamek downloaded most of these documents while he was secretly engaged in discussions with Etimine about potential employment.

29.     Zamek recently admitted in deposition testimony that, for several months before he left Borax, he was in discussions with Etimine about taking a position at Etimine in which he would sell products that compete with the products he was selling at Borax.

30.     In his deposition testimony, Zamek admitted that, on the day he left Borax, he was expecting to receive a job offer from Etimine within just a few days.  Zamek also admitted at his deposition that he did not share this information with anyone at Borax.  In fact, Zamek admitted that he deliberately misled Borax by saying he planned to retire.  At the time, Borax had no reason not to trust Zamek, so it accepted and relied upon his statement that he was taking time away from work.

31.     Shortly after Zamek left Borax, Borax employees learned that Zamek started working for Etimine.

32.     Thereafter, Borax conducted an analysis of Zamek's downloading activity while logged into Borax's computer system and of his Borax email account and internet activity.

33.     That analysis showed that, unbeknownst to Borax, Zamek had transferred more than 650 files from his Borax computer to two USB drives starting soon after he was notified of his termination.

34.     Zamek transferred increasing numbers of confidential files to the USB drives as he got closer to his termination date.  In fact, Zamek transferred approximately 285 of the 650 files to the USB drives during the last 10 days of his employment at Borax and 62 of those files were downloaded on the last day he worked, immediately before he turned in his Borax computer.

35.     Again, Borax did not know this at the time, but now knows based on Zamek's deposition testimony that, at the time Zamek downloaded these hundreds of Borax documents onto two USB drives, he expected and intended to start working for Etimine almost immediately after his Borax employment ended.

36.     The documents Zamek transferred to the USB drives contained Borax's confidential business information and trade secrets, including information that fell outside of his job responsibilities.  That information was not known to the public or to Borax's competitors.

37.     For example, approximately 21 documents include in their file name "Big Sheet," which contain all of Borax's financial information and internal competitive intelligence for the

entire global marketplace for borates in one giant spreadsheet. Big Sheets include historical and forecasted pricing and volume information for all of Borax's products and customers, Borax's customer lists, and forecasts about global markets. This compilation of data is neither available to Borax's competitors nor can they easily recreate it. At his deposition, Zamek specifically admitted that the pricing information in these documents is not known to competitors. This information would be enormously useful to Borax's competitors because it provides a detailed picture of Borax's entire business.

38.     One document Zamek downloaded titled "America Sales Meeting Sept 26th Day 1" is a consolidation of sales managers' presentations at Borax's last sales meeting in 2018, which included Borax's sales strategy for South American agriculture—Borax's largest growth market and an area in which Borax competes with Etimine therefore that information would provide a competitive advantage to Etimine.

39.     Approximately 128 of the documents Zamek downloaded relate to Borax's largest customer, including information about pricing and contracts. That information would be useful to Etimine because it competes with Borax for that customer's business and does not know all of the terms that Borax provides that customer.

40.     Approximately 177 of the documents are "mandate" documents, which provide details about sales with specific customers, including information about how various customers fit into Borax's business strategies. This confidential customer and strategy information would be useful to Borax's competitors because they sell very similar products so small differences in strategies with customers can be crucial to making a sale.

41.     Zamek also downloaded approximately 49 "cheat sheets" onto the USB drives, which are documents created by regional sales managers that contain costing information. Additionally, some of the documents contained information about the prices that Borax pays to transport borates from its mines to its customers.  That information about costing and transportation costs is not known to Borax's competitors and would provide a competitive advantage to those entities because it would provide insight into Borax's pricing structure and margins.  At his deposition, Zamek admitted that cheat sheets contain information that is not known to competitors and that companies take steps to keep their competitors from knowing that type of information.

42.     Prior to his departure, Zamek provided one USB drive with a small subset of the documents he downloaded to the employee who took over his job duties.  However, Zamek did not return the other USB drive that contained more than 650 confidential and trade secret documents, including the big sheets, mandate documents, cheat sheets, and customer information, to anyone at Borax.

43.     Zamek downloaded some of those 650 documents onto the second USB drive late in the evening, the night before his last day in the office, after he had handed the first USB drive to the Borax employee who was taking over his job.  At that point, he did not have any plans to meet with that employee the next day, indicating that he did not download the documents with the intention of giving the second USB to anyone at Borax.  In fact, he had no other work to perform for Borax that would have explained his decision to download hundreds of Borax documents.

44.     At his deposition or otherwise, Zamak has offered no credible explanation as to why he downloaded hundreds of Borax files to a USB drive on his last day of Borax employment and shortly before he expected to receive a job offer from Etimine.  Zamek also offers no credible explanation as to what he did with the Borax files he downloaded onto that USB drive. Instead, Zamek's testimony is that he threw the USB drive into a waste basket in a Borax conference room on his last day in the office after spending the prior evening downloading documents to that USB drive.

45.     Zamek knew he was not allowed to take the second USB drive with those documents with him when he left Borax, because such action was expressly prohibited by the terms of the Confidentiality Agreement.

46.     Borax's analysis of Zamek's downloading activity was able to capture Zamek's activity only while he was logged onto Borax's network.  Zamek likely also downloaded additional confidential and/or trade secret documents from his desktop to a USB drive or some other device while he was not logged onto Borax's network.  Given the suspicious nature of the timing of when Zamek downloaded the documents to the USBs, it is likely that Zamek took additional Borax confidential and/or trade secret information.

47.     In addition to showing that Zamek transferred confidential files to USB drives, the analysis also showed that during his last week of employment, Zamek forwarded or attempted to forward numerous emails from his Borax email account to his personal email address (markzamek@yahoo.com).  Many of the emails that Zamek attempted to forward were blocked by Borax's system.

48.     Zamek also set up his Borax e-mail account to automatically forward emails to his personal email account around this time.  These actions violated Borax's Standard for Acceptable Use of Information and Electronic Resources ("Acceptable Use Policy")

49.     Section 4.2 of that policy prohibits employees from transferring Borax information or data onto non-Borax assets, such as home computers or USB drives, or services, such as Gmail or Dropbox, "unless that service or asset has been authorized for such use by [the employee's] leader in consultation with Cyber Security."

50.     Further Section 4.3 of the policy says that employees must not automatically forward emails from their Borax accounts to any email services that are not managed by Borax.

51.     Zamek also admitted at his deposition that he used his own personal home computer to conduct Borax business without obtaining permission from Borax which further violated the Acceptable Use Policy.

52.     After learning from the investigation that Zamek likely took its confidential information and trade secrets, Borax sent Zamek a letter on February 11, 2019, asking him to sign a confirmation stating that any "confidential information that [he] may have transferred, downloaded, or otherwise took has been destroyed" and that he has "not, and will not disclose or use any of U.S. Borax's confidential information."

53.     Zamek refused to sign that declaration.

54.     Thereafter, Borax and its counsel had several communications with Zamek's counsel, but, ultimately, Zamek was unwilling to go on the record with a declaration or other clear representation and state that he had destroyed all copies of any confidential Borax

12

information in his possession and describe any way in which that information was used or to state that no such information was used, disclosed or downloaded.

55.     After Borax filed its First Amended Complaint, it learned from Etimine that Zamek had transferred confidential Borax documents to his company-issued computer at Etimine, including at least one document that was on the USB drive that Zamek claimed he threw out before leaving Borax.

56.     The confidential documents Zamek transferred to Etimine included a document with the prices that Borax pays to transport borates from its mines to its customers, and a document listing sales numbers for more than one hundred Borax customers.

57.     Zamek also transferred to his Etimine-issued work computer a customer profile document for one of Borax's largest customers.  That profile included information about the customer's contract with Borax, Borax's sales to the customer, and Borax's current and future strategy with the customer.

58.     The absence of injunctive relief will leave Borax with no adequate remedy at law, the entry of injunctive relief against Zamek and in favor of Borax will not unduly harm or burden Zamek, and public policy favors the entry of injunctive relief against Zamek and in favor of Borax because such relief will prevent unlawful conduct and will preserve and protect Borax's legitimate business interests for which it paid good and valuable consideration to Zamek.

## ZAMEK'S INTERFERENCE WITH BORAX'S RELATIONSHIP WITH A KEY CUSTOMER

59.     Zamek interfered with contractual relationships between Borax and its customers in violation of the duty of loyalty.

60.     Borax uncovered an example of this behavior related to a large customer.

61.     In July 2017, an important customer signed a proposed amendment to a long-term sales contract.  The amendment extended the parties' contract under which Borax agreed to supply all of that customer's borates through December 31, 2019.  The customer e-mailed the signed amendment directly to Zamek.

62.     Zamek subsequently told his immediate supervisor that no amendment was in place.

63.     In December 2018, Zamek was still a Borax employee but knew his last day with Borax was imminent.  Zamek was actively engaged in efforts to start working for Etimine.  He again confirmed to his immediate supervisor at Borax that no formal amendment to the ongoing sales agreement with that customer was in place.  Zamek then sent a new proposed amendment to the customer with terms that were less favorable for the customer than the one that had been signed by the parties in July 2017.

64.     Zamek's actions caused the customer to turn to the market to test prices from competitors such as Etimine.

65.     Later, after Zamek began working for Etimine, he reached out to that same customer to try to sell borates.  Although he had earlier concealed this fact from Borax, Zamek knew Borax had a signed agreement with the customer to supply all of the customer's borates through December 31, 2019. Zamek knew this because the customer had sent that agreement directly to him in July 2017.

66.     Zamek's deceptive actions were almost successful, but Borax eventually found the executed contract amendment, and was able to secure the customer's business through the remainder of 2019. Nonetheless, Zamek's actions are certain to have damaged Borax's goodwill with this customer, and they reinforce the inference that Zamek has and will continue to engage in deceptive conduct to the detriment of Borax.

## COUNT 1
## Preliminary and Permanent Injunction

67.     The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

68.     Zamek's conduct constitutes material breaches of his Confidentiality Agreement and Severance Agreement with Borax, misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act, and the Defend Trade Secrets Act, a violation of the Computer Fraud and Abuse Act, and conversion as described below.

69.     By virtue of the foregoing, Borax has demonstrated a likelihood of success on the merits.

70.     Borax is entitled to injunctive relief against Zamek because there will be irreparable harm to Borax should Zamek disclose Borax's confidential information and trade secrets to his new employer and/or use Borax's confidential information and trade secrets in connection with his efforts on his new employer's behalf.  Zamek's new employer, Etimine, has disclosed that Zamek has already used or disclosed Borax's confidential and trade secret information, thereby suggesting he is likely to continue doing so in the future if he is not permanently enjoined.

71.     The losses suffered by Borax as a result of Zamek's conduct cannot be fully or adequately compensated in money damages, and Borax does not have an adequate remedy at law.

72.     Greater injury will be inflicted upon Borax and its customers by the denial of relief than would be inflicted upon Zamek by the granting such relief.

73.     Granting such relief will be in the public's interest.

**WHEREFORE**, Borax respectfully requests the following relief:

(1) Preliminary and permanent injunctive relief prohibiting Defendant from violating the terms of his Confidentiality Agreement with Borax,

(2) Preliminary and permanent injunctive relief prohibiting Defendant from violating the terms of his Severance Agreement with Borax,

(3) Preliminary and permanent injunctive relief requiring Defendant to return and not use Borax's confidential information and trade secrets;

(4) An Order from the Court requiring Defendant to provide access to the devices and accounts he controls for forensic review;

(5) An Order from the Court requiring Defendant to provide a statement under oath stating whether he has used Borax's confidential information and trade secrets and providing the details relating to same;

(6) An Order from the Court precluding Defendant from contact with customers whose information he wrongfully took;

(7) The costs of these proceedings;

(8) Attorneys' fees under PUTSA and DTSA;

(9) Prejudgment interest; and

(10)     All such other relief as this Court deems appropriate.

## COUNT II
## Breach of Contract- Confidentiality Agreement

74.     The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

75.     In consideration for his employment by Borax and Borax paying him his salary and other compensation, Zamek entered into the Confidentiality Agreement.

76.     The Confidentiality Agreement is a valid and enforceable contract.

77.     Borax has duly performed all of its obligations under the Confidentiality Agreement.

78.     The Confidentiality Agreement Zamek signed contains reasonable restrictive covenants, including a restrictive covenant preventing Zamek from using Borax's confidential information, during or after his employment with Borax, for any use other than for Borax's business.

79.     Further, the Confidentiality Agreement required Zamek to return all confidential Borax information prior to the end of his employment.

80.     Zamek took and failed to return Borax confidential documents and shared at least some of those documents with Etimine in breach of the Confidentiality Agreement.

81.     By engaging in the conduct described herein, Zamek is violating his express written Confidentiality Agreement with Borax. As a consequence of the foregoing, Borax has suffered and will continue to suffer irreparable harm and other loss.

**WHEREFORE**, Borax respectfully requests the following relief

(1) Preliminary and permanent injunctive relief prohibiting Defendant from violating the terms of his Confidentiality Agreement with Borax,

(2) Preliminary and permanent injunctive relief requiring Defendant to return and not use Borax's confidential information and trade secrets;

(3) An Order from the Court requiring Defendant to provide access to the devices and accounts he controls for forensic review;

(4) An Order from the Court requiring Defendant to provide a statement under oath stating whether he has used Borax's confidential information and trade secrets and providing the details relating to same;

(5) An Order from the Court precluding Defendant from contact with customers whose information he wrongfully took;

(6) Incidental and consequential damages as permitted by law;

(7) Exemplary and punitive damages as permitted by law;

(8) The costs of these proceedings;

(9)    Prejudgment interest; and

(10)    All such other relief as this Court deems appropriate.

## COUNT III
## Breach of Contract- Severance Agreement

82.    The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

83.    In consideration for a severance payment of $171,234.74 and other benefits, Zamek entered into the Severance Agreement with Borax.

84.    The Severance Agreement is a valid and enforceable contract.

85.    Borax has duly performed all of its obligations under the Severance Agreement.

86.    The Severance Agreement Zamek signed contains reasonable restrictive covenants, including a restrictive covenant preventing Zamek from publishing, disclosing, or making accessible to another person Borax's confidential information.

87.    Further, the Severance Agreement required Zamek to return all confidential Borax information prior to the end of his employment.

88.    Zamek took and failed to return Borax confidential documents and shared at least some of those documents with Etimine in breach of the Severance Agreement.

89.     By engaging in the conduct described herein, Zamek is violating his express written Severance Agreement with Borax.  As a consequence of the foregoing, Borax has suffered and will continue to suffer irreparable harm and other loss.

**WHEREFORE**, Borax respectfully requests the following relief.

(1)     Preliminary and permanent injunctive relief prohibiting Defendant from violating the terms of his Severance Agreement with Borax,

(2)     Preliminary and permanent injunctive relief requiring Defendant to return and not use Borax's confidential information and trade secrets;

(3)     An Order from the Court requiring Defendant to provide access to the devices and accounts he controls for forensic review;

(4)     An Order from the Court requiring Defendant to provide a statement under oath stating whether he has used Borax's confidential information and trade secrets and providing the details relating to same;

(5)     An Order from the Court precluding Defendant from contact with customers whose information he wrongfully took;

(6)     An Order requiring Defendant to return his severance payment;

(7)     Incidental and consequential damages as permitted by law;

(8)     Exemplary and punitive damages as permitted by law;

(9)     The costs of these proceedings;

(10)   Attorneys' fees;

(11)   Prejudgment interest; and

(12)   All such other relief as this Court deems appropriate.


**COUNT IV**
**Misappropriation of Trade Secrets – Pennsylvania Uniform Trade Secret Act**

90.    The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

91.    Borax's "Big Sheets," mandate documents, customer lists, customer pricing information and contract terms, pricing and volume forecasting information, strategy information, revenue data, and costing and transport information all constitute trade secrets. This confidential information is not generally known to, and not readily ascertainable by proper means by, other people who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

92.    Borax has taken reasonable measures to keep such information secret and confidential.

93.    At all relevant times, Borax maintained stringent security measures to preserve the secrecy of its trade secrets. For example, Borax-owned computer systems are password protected and require employees to acknowledge a confidentiality notice when signing on to Borax-owned computers. Further, Borax requires employees to undergo training about

confidentiality and trade secrets, and to follow policies and procedures for accessing, transmitting, storing, generating and/or handling trade secrets.

94.     Borax requires employees with access to trade secret information to agree to not disclose or use any confidential information; disseminate any confidential information; and upon termination to return all confidential information.

95.     Due to these security measures, Borax's confidential, proprietary, and trade secret information is not available for unauthorized personnel to use through any legitimate means.

96.     Zamek has improperly taken such trade secret information, and disclosed it to Borax's competitor.

97.     Such misappropriation of trade secrets is a violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq*.;

98.     Such misappropriation is willful and malicious, and has damaged Borax and will continue to damage Borax.  As a result of Zamek's wrongdoing and violation of the PUTSA, Borax has suffered and continues to suffer substantial and irreparable harm because of the loss of its trade secrets and good will and unfair attack on its competitive advantage, resulting in harm not fully compensable by money damages.

     **WHEREFORE**, Borax seeks all available relief under the Pennsylvania Uniform Trade Secrets Act, including:

     (1) Preliminary and permanent injunctive relief prohibiting Defendant from misappropriating Borax's trade secrets;

(2) Preliminary and permanent injunctive relief requiring Defendant to return and not use Borax's trade secrets;

(3) An Order from the Court requiring Defendant to provide access to the devices and accounts he controls for forensic review;

(4) An Order from the Court requiring Defendant to provide a statement under oath stating whether he has used Borax's trade secrets and providing the details relating to same;

(5) Actual damages, and/or the imposition of a reasonable royalty for Defendant's unauthorized disclosure of use of Borax's trade secrets;

(6) Incidental and consequential damages as permitted by law;

(7) Exemplary and punitive damages as permitted by law;

(8) The costs of these proceedings;

(9) Attorneys' fees;

(10) Prejudgment interest; and

(11) All such other relief as this Court deems appropriate.


**COUNT V**
**Misappropriation of Trade Secrets – Defend Trade Secrets Act**

99. The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

100.     Zamek has misappropriated Borax's trade secrets.  Those trade secrets are related to business conducted in interstate commerce.

101.     Upon information and belief, Zamek possesses Borax's confidential and trade secret information and has used and will continue to use that information in competition with Borax.

102.     Zamek has willfully and maliciously appropriated Borax's trade secrets.

103.     As a result of Zamek's wrongdoing and violation of the DTSA, Borax has suffered and continues to suffer substantial and irreparable harm because of the loss of its trade secrets and good will and unfair attack on its competitive advantage, resulting in harm not fully compensable by money damages.

104.     Borax is entitled to exemplary damages and attorney's fees due to Zamek's willful and malicious appropriation of its trade secrets.

105.     Borax is entitled to injunctive relief prohibiting Zamek from using its trade secrets.

106.     Borax is entitled to damages for the actual loss and unjust enrichment of Zamek caused by misappropriation of Borax's trade secrets.

**WHEREFORE**, Borax seeks all available relief under the Defend Trade Secrets Act, including:

(1)     Preliminary and permanent injunctive relief prohibiting Defendant from misappropriating Borax's trade secrets;

(2)    Preliminary and permanent injunctive relief requiring Defendant to return and
       not use Borax's trade secrets;

(3)    An Order from the Court requiring Defendant to provide access to the devices
       and accounts he controls for forensic review;

(4)    An Order from the Court requiring Defendant to provide a statement under
       oath stating whether he has used Borax's trade secrets and providing the details
       relating to same;

(5)    Actual damages, including damages for actual losses caused by Defendant's
       misappropriation of  trade secrets, damages for any unjust enrichment caused
       by the misappropriation,  and/or the imposition of a reasonable royalty for
       Defendant's unauthorized disclosure of use of Borax's trade secrets;

(6)    Incidental and consequential damages as permitted by law;

(7)    Exemplary and punitive damages as permitted by law;

(8)    The costs of these proceedings;

(9)    Attorneys' fees;

(10)   Prejudgment interest; and

(11)   All such other relief as this Court deems appropriate.

## COUNT VI
## Conversion

107.     The allegations contained in preceding and following paragraphs are incorporated

herein by reference with the same force and effect as though set forth in full below.

108.     The confidential information of Borax was and is the property of Borax, and was

property to which Zamek had no possessory right.

109.     Zamek wrongfully took that information through misconduct, including violating

Borax's Standard for Acceptable Use of Information and Electronic Resources.

**WHEREFORE**, Borax respectfully requests the following relief

(1)     Preliminary and permanent injunctive relief requiring Defendant to return and

not use Borax's confidential information and trade secrets;

(2)     Incidental and consequential damages as permitted by law;

(3)     Exemplary and punitive damages as permitted by law;

(4)     The costs of these proceedings;

(5)     Prejudgment interest; and

(6)     All such other relief as this Court deems appropriate.

## COUNT VII

## Breach of the Fiduciary Duty of Loyalty

110.    The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

111.    As an employee of Borax, Zamek held a position of trust and confidence and owed Borax duties of loyalty, honesty, and trustworthiness.

112.    By engaging in the activities and practices described herein, including renegotiating a contact with a customer with less favorable terms for that customer in order to drive that customer's business away from Borax while he was still working at Borax, Zamek violated his duty of loyalty.

113.    Zamek's conduct was willful, malicious, wanton, intentional, and unjustifiable, and it has been and is the direct and proximate cause of immediate and irreparable harm as well as money damages to Plaintiff.

**WHEREFORE,** Borax seeks damages in excess of $75,000 exclusive of interest and costs.

## COUNT VII

## Interference With Existing Contractual Relationship

114.    The allegations contained in preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

115. By engaging in the activities and practices described herein with respect to its customer contract, Zamek tortuously interfered with Borax's existing contractual relationship with that customer.

116. The interference was done intentionally and with malice.

117. Borax has suffered damages as a result of Zamek's interference with its contractual relationship with its customer.

**WHEREFORE,** Borax seeks injunctive relief and damages in excess of $75,000 exclusive of interest and costs.

Respectfully submitted,

Date: June 24, 2019

Janice G. Dubler (PA ID 76578)
Daniel P. O'Meara (PA ID 53535)
Rachel C. Stone (PA ID 318656)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1735 Market Street, Suite 3000
Philadelphia, PA 19103
(215) 995-2800
janice.dubler@oglretree.com
rachel.stone@ogletree.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing document upon the

following via First Class Mail, this 24th day of June 2019:

Casey Green
Rachel Dennis
Sidkoff, Pincus & Green, P.C.
2700 Jefferson Tower
1101 Market Street
Philadelphia, PA 19103

_Rachel C. Stone_
Rachel C. Stone

# EXHIBIT 1



## AGREEMENT REGARDING CONFIDENTIAL INFORMATION, INVENTIONS AND INTELLECTUAL PROPERTY

In part consideration for my employment by U.S Borax Inc., (hereinafter referred to as the "Company"), and the payment to me of the salary or other compensation that I shall receive during my employment, I agree as follows:

I will not, without the Company's prior written permission, disclose to anyone outside of the Company or use in other than the Company's business, either during or after my employment, any information or material of the Company, or any information or material received in confidence from third parties by the Company, which is deemed by the Company in its sole discretion to be confidential. If I leave the employ of the Company, I will return all property of the Company in my possession, including all confidential information or material such as drawings, notebooks, customer lists, reports and other documents, as well as any copies of the same. Information or material which the Company may deem confidential is any information or material which has not been made available generally to the public and was or is: (a) generated or collected by or utilized in the operations of the Company and which relates to the actual or anticipated business or research and development of the Company; or (b) suggested by or resulting from any task assigned to me or work performed by me for or on behalf of the Company.

I will not disclose to the Company, use in its business, or cause it to use, any information or material which is confidential to others without their express consent.

I hereby assign to the Company my entire right, title and interest in any idea, invention, design of a useful article (whether the design is ornamental or otherwise), computer program and related documentation, and other work of authorship (all hereinafter collectively called "Developments"), made or conceived during my employment by the Company solely or jointly by me, or created wholly or in part by me, whether or not such Developments are patentable, copyrightable or susceptible to other forms of protection, and provided the Developments: (a) are related to the actual or anticipated business or research or development of the Company; or (b) are suggested by or result from any task assigned to me or work performed by me for or on behalf of the Company.

I will promptly disclose any Developments to the Company's management and on the Company's request, promptly execute a specific assignment of title to the Company or its designee and do anything else reasonably necessary to enable the Company or its designee to secure a patent, copyright or other form of protection therefore in the United States and in all other countries.

280701 9/95

I have identified on the attachment all Developments in which I have any right, title or interest, and which were previously made or conceived by me but neither published nor filed in any Patent office and which I desire to be excluded from this Agreement.

I understand that this Agreement between me and the Company does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on my own time, and (a) which does not relate (1) to the business of the Company or (2) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the Company.

This Agreement is executed in the State of California and the rights and obligations of the parties shall be governed by the laws of the State of California.

EXECUTED, this date  5/23/00  , at _____ County, California.

Name of Employee:  Mark Zamek

Signature:  _____

# EXHIBIT 2

**THIS IS A LEGAL DOCUMENT AND CONTAINS A FULL RELEASE OF CLAIMS. THE EMPLOYEE IS ADVISED TO CONSULT LEGAL COUNSEL PRIOR TO EXPIRY OF THE REVOCATION PERIOD**

## SEPARATION AND RELEASE OF CLAIMS AGREEMENT

This Separation and Release of Claims Agreement (hereinafter "Agreement") is made and entered into on 2 January 2019 and its effective date shall be the (8th) day after Employee signs and does not revoke this Agreement ("the EffectiveDate") by and between U.S. Borax Inc (hereinafter "Employer") and Mark Zamek (hereinafter "Employee").

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is acknowledged by both parties, Employer and Employee hereby agree to the following:

1. Employment Relationship

Employer and Employee mutually agree that the employer-employee relationship between them ended effective 2 January 2019 (hereinafter the "Separation Date") pursuant to a reduction in force. After the Separation Date, Employee will not represent himself as being an employee, officer, attorney, agent or representative of Employer for any purpose. The parties mutually agree that the relationship created by this Agreement is purely contractual and no employer-employee relationship is intended or created. Employee hereby acknowledges receipt of payment for all wages, salary, expenses and other compensation due up to and including the Separation Date based on Employee's employment with Employer, in accordance with Employer's regular payroll practice, which shall include pay for all accrued but unused vacation pay, as well as a pro-rated STIP payment in accordance with the estimate previously provided to the Employee. Employee acknowledges and agrees that Employee will not receive any other compensation, other than that expressly provided in Section 2 below.

2. Consideration

a. In consideration for Employee's execution, non-revocation of, and compliance with Employee's obligations in this Agreement, including the waiver and release of claims in Section 4 of this Agreement, Employer agrees to pay Employee a termination payment (the "Termination Payment") equal to the gross sum of One Hundred Seventy One Thousand Two Hundred Thirty Four Dollars and Seventy Four Cents ($171,234.74), as specified in Section 2(b) of this agreement, less the usual and customary tax withholdings and deductions (i.e., federal, state, social security and Medicare taxes, hereafter referred to as "Payroll Taxes") which will be deducted from the foregoing gross amount paid to the Employee. The amount of the Termination Payment is acknowledged by the Employee as full and final payment and in full and complete satisfaction of all claims by Employee against Employer and Employer's 'Related Parties' (as that term is defined in Section 4(a) of this Agreement), and is in excess of what Employee would otherwise be entitled upon a termination based on his/her employment. The Termination Payment shall be paid to Employee within thirty (30) business days of Effective Date of this Agreement. Employee agrees that Employer has not made any representations to Employee regarding the legal or tax consequences of any funds received pursuant to this Agreement. Employee agrees to pay any federal, state or other taxes remaining due that may be required to be paid with respect to the Termination Payments under this Agreement and agrees to indemnify and hold Employer and its Related Parties harmless for any tax liability whatsoever, to the extent not withheld by the Employer.

b. The Termination Payment, except for the COBRA portion which is to be grossed up for tax purposes, shall be the following less any usual and customary tax withholdings and deductions

(i) Severance payment of 38 weeks in the amount of $160,505.35; and

(ii) Payment of 6 month(s) of COBRA expenses in the amount of $10,729.39

      c.     In addition to the Termination Payment you will be entitled to 3 months of career transition counseling beginning as initiated by Employee, but not more than 30 days prior to Separation Date, and not longer than 3 months from Separation Date as provided through Employer's contracted provider.

      d.     Any consideration or Termination Payment paid is not intended to effect, supplant, or replace any rights Employee may have under any long term incentive plans, share option plans, employee stock option plans, or performance share plans. Employee will be defined as good leavers and be entitled to any vested rights employee may have as defined under each respective plan.

3.   <u>Legal Obligations and Liabilities</u>

      a.     Employee acknowledges that Employer has no prior legal obligations to provide the Termination Payment or other consideration herein and absent the execution of this Agreement, Employee would not otherwise be entitled to receive that consideration.

      b.     Employee acknowledges that this Agreement does not constitute an admission of wrongdoing on the part of Employer and Employer specifically denies any wrongdoing or liability related to Employee, Employee's employment, or separation therefrom.

4.   <u>Release of Claims and Covenant Not to Sue</u>

      a.     In consideration of Employer's agreement to provide Employee with the consideration set forth herein, EMPLOYEE WAIVES, RELEASES, AND FOREVER DISCHARGES EMPLOYER AND ITS PREDECESSORS, SUCCESSORS, ASSIGNS, OFFICERS, DIRECTORS, SHAREHOLDERS, DIRECT AND INDIRECT PARENT COMPANIES, DIRECT AND INDIRECT SUBSIDIARY COMPANIES, AFFILIATES, AGENTS, EMPLOYEES, AND REPRESENTATIVES (HEREINAFTER COLLECTIVELY REFERRED TO AS "RELATED PARTIES") FROM ANY AND ALL CLAIMS, RIGHTS, DEMANDS, DAMAGES, LIABILITIES, FINANCIAL OBLIGATIONS, CAUSES OF ACTION OF ANY NATURE, AND/OR ANY OTHER DISPUTE WHATSOEVER, INCLUDING BUT NOT LIMITED TO THOSE SPECIFICALLY NAMED OR DISCUSSED IN THIS AGREEMENT, THAT EMPLOYEE MAY HAVE, HAVE EVER HAD OR MAY IN THE FUTURE HAVE AGAINST EMPLOYER AND ITS RELATED PARTIES, THAT MAY LAWFULLY BE WAIVED AND RELEASED, ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S HIRE, BENEFITS, EMPLOYMENT, OR SEPARATION FROM EMPLOYMENT WITH EMPLOYER, AND/OR ANY EVENTS OCCURRING PRIOR TO THE SIGNING OF THIS AGREEMENT, WHETHER KNOWN OR UNKNOWN, ABSOLUTE, CONTINGENT OR OTHERWISE, AT THE TIME THIS AGREEMENT IS EXECUTED AND/OR AT THE TIME SUCH PAYMENTS ARE MADE TO THE EMPLOYEE.

This Section includes but is not limited to all claims capable of being waived under or arising from the following laws, as amended where applicable:

         o  local, state, or federal common law, statute, regulation, or ordinance;
         o  Title VII of the Civil Rights Act of 1964;
         o  Section 1981 of the Civil Rights Act of 1866;
         o  the Age Discrimination in Employment Act of 1967;
         o  the Americans with Disabilities Act of 1990;
         o  the Family and Medical Leave Act;
         o  the Employee Retirement Income Security Act of 1974;
         o  the Health Insurance Portability and Accountability Act;
         o  the Occupational and Safety Health Act;
         o  the Fair Labor Standards Act;

o the Equal Pay Act;
o the Uniformed Services Employment and Re-employment Act of 1994;
o Executive Orders 11246 and 11141;
o the Worker Adjustment and Retraining Notification Act;
o the Rehabilitation Act of 1973;
o the National Labor Relations Act;
o any other civil rights, employment and labor laws, statutes, regulations, ordinances of any state or the United States, and all contract, tort or other common or statutory law theories.

b.     Employee further agrees not to bring, continue, or maintain any legal proceedings of any nature whatsoever against Employer and/or Related Parties before any court, arbitrator, or any other judicial forum.  To the extent allowed by law, this includes but is not limited to any such claims, demands, disputes, damages, liabilities, and/or causes of action for legal or equitable remedies under the laws set forth in Section 4(a), but this clause shall specifically exclude any claims for state unemployment benefits to which employee may be entitled.

c.     With respect to the Age Discrimination in Employment Act ("ADEA"), nothing in this Agreement shall be interpreted or applied in a manner that affects or limits Employee's ability to challenge (with a lawsuit or administrative charge) the validity of Employee's release of Employer and its Related Parties in this Agreement for age claims under the ADEA.   Employee's waiver and release of any potential claim under the ADEA shall not apply to any act or event occurring after the date on which Employee executes this Agreement.

d.     Subject to any lawful waivers or releases under Section 4(a) of this Agreement, without waiving any prospective or retroactive rights under the Family and Medical Leave Act ("FMLA"), Employee acknowledges that Employer has provided Employee with all benefits, if any, potentially or actually due under the FMLA.

e.     Subject to any lawful waivers or releases under Section 4(a) of this Agreement, without waiving any prospective or retroactive rights under the Fair Labor Standards Act ("FLSA"), Employee acknowledges that Employer has properly provided Employee with all wages, benefits, and compensation, if any, due Employee under the FLSA.

f.     Employee acknowledges and understands that this Agreement does not prohibit Employee from filing an administrative charge or claim with the Equal Employment Opportunity Commission ("EEOC") or any state or local agency authorized by the EEOC to accept such charge or claim.  In addition, this Agreement does not limit your right to testify, assist, or participate in an investigation, hearing, or proceeding conducted by the EEOC. It does, however, preclude Employee from receiving any monetary, injunctive, or other personal relief related in whole or in part to claims released in this Agreement, specifically excluding whistleblower claims arising under the Securities Exchange Act of 1934, as amended. Should any individual or entity who is not subject to this Agreement bring an action against Employer or its Related Parties which results in assignable recovery or relief for Employee, Employee waives any right to such recovery or relief and specifically assigns to Employer or its Related Entities, as the case may be, the right to any such recovery or relief arising from such proceeding, specifically excluding whistleblower claims arising under the Securities Exchange Act of 1934, as amended.



g.     Employee acknowledges and understands that this Agreement does not prohibit Employee from filing an administrative charge or claim with the National Labor Relations Board. It does, however, preclude Employee from receiving any monetary, injunctive, or other personal relief related in whole or in part to claims released in this Agreement, specifically excluding whistleblower claims arising under the Securities Exchange Act of 1934, as amended. Should any individual or entity who is not subject to this Agreement bring an action against Employer or its Related Parties which results in assignable recovery or relief for Employee, Employee waives any right to such recovery or relief and specifically assigns to Employer or its Related Entities, as the case may be, the right to any such recovery or relief arising from such proceeding, specifically excluding whistleblower claims arising under the Securities Exchange Act of 1934, as amended.

h.     Employee agrees that this Agreement is also binding on Employee's heirs, assigns, family members, legal representatives, or any other individual or entity acting on or for Employee's behalf.

5.   Confidentiality

a.     Except as otherwise required or provided by law, Employee agrees to strictly maintain the confidentiality of this Agreement by not disclosing any of the terms or conditions of this Agreement, to any individual or entity except in a privileged communication, or if disclosure is required by law or compulsory process. Employee may disclose the terms or conditions of this Agreement to Employee's spouse, legal counsel, or any accountant or accounting firm specifically retained by Employee or Employee's spouse, provided that Employee must simultaneously inform that person that the person must keep the information strictly confidential and that the person may not disclose the information to any other person without advice written consent of Employer, and that any disclosure by such person will constitute a disclosure by Employee except where the disclosure is required by law or compulsory process.

b.     Employee agrees that all information which Employee may now possess, may obtain in the course of and prior to, during, or after his separation from employment, or may create prior to the end of his employment, or otherwise relating to any current or former employment or to the business of Employer or its Related Parties as conducted or obtained by the Employee on or prior to the date of termination ("Confidential Information"), shall not be published, disclosed, or made accessible by Employee to any other person, either before or after the effective date of Employee's employment separation. Employee shall return all tangible evidence of such information to their leader on or before the Separation Date. Nothing contained herin shall be deemed to require the preservation of such information if the same has been made available to the general public by the Employer. In addition, if the Employee entered into a prior agreement regarding the preservation of Confidential Information of the Employer during the course of Employee's employment, that agreement shall remain in full force and effect.

6.   Non-Disparagement

Employee agrees that Employee will not make any disparaging, defamatory, malicious, slanderous, libelous or otherwise negative or false statements about Employer, its Related Parties, or about any aspect of Employee's employment with Employer, or separation therefrom, and/or the severance terms contained in this Agreement, whether orally, in writing, in e-mails, on the Internet or otherwise.

7. No Workplace Illness or Injury

   Employee declares and agrees that, except to the extent of a previously-filed claim for worker's compensation benefits, Employee has not experienced or incurred any illness or injury in course or scope of Employee's employment with Employer at any time before he signs this Agreement.

8. Warranty of return of Employer Property

   Payment of the consideration set forth in Section 2 is conditioned upon Employee first returning all Employer property and submission of all business expense reports in a satisfactory and reasonable manner as required by Employer policies and practices. Employer property includes but is not limited to any assigned vehicles, office and building keys, card keys, credit cards, calling and telephone charge cards, PC systems, digital storage devices, laptops, pagers, cellular telephones, e-mail and voice mail passwords, all originals and copies of Employer products or documents, all originals and copies of customer or product lists, and/or any other property belonging to Employer.

9. Performance and Breach

   Employee understands and agrees that Employer's obligation to perform under this Agreement is conditioned upon Employee's agreements with and covenants to Employer as set forth in this Agreement. In the event Employee breaches any provision of this Agreement, Employee acknowledges that Employer shall have the right to pursue any and all available legal and equitable remedies against Employee, including but not limited to injunctive relief to enforce this Agreement. In the event of any litigation to enforce the terms of this Agreement, the non-prevailing party will be responsible for paying the reasonable costs and attorney's fees incurred by the prevailing party in the pursuit or defense of such a suit.

10. Future Assistance

   a.    In order to allow a smooth transition and not disrupt Employer business operations following Employee's separation, upon Employer's request, Employee agrees to provide Employer with specific operations information and/or any other information Employer deems necessary within a reasonable, timely, and clear manner. Employee acknowledges and agrees that their agreement to cooperate and assist in this regard is supported by the consideration set forth in Section 2 of this Agreement and does not entitle Employee to additional compensation.

   b.    Employee agrees that now and in the future Employee will cooperate and assist Employer to the best of Employee's ability in the event of litigation or claims involving Employer or its Related Parties, as it concerns any subject matter within the scope of Employee's employment with Employer. While Employee's agreement to cooperate and assist in this regard is supported by the consideration set forth in Section 2 of this Agreement, to the extent Employee is required to assist Employer in this manner, Employer will reimburse Employee for reasonable out-of-pocket expenses associated with Employee's assistance. It is within Employer's sole discretion to determine the reasonableness of Employee's expenses.

11. Governing Law

This Agreement shall be construed in accordance with the laws of the State of Pennsylvania excluding any conflict of law principles that would require the application of the law of any other jurisdiction and any applicable federal laws.

12.   Entire Agreement and Modification of Agreement

This Agreement constitutes the entire understanding of the parties, and no representation, promise, or inducement not included in this Agreement shall be binding upon the parties, with the exception of any prior agreement between the parties (with regard to Confidentiality or post-employment restrictions, which shall remain in full force and effect). Employee acknowledges that the only consideration for the signing of this Agreement is the terms set forth herein and that no other promises or assurances of any kind have been made to Employee by Employer or any other entity or person as an inducement for Employee to sign this Agreement. This Agreement may not be changed orally, but only by an agreement in writing signed by the parties or their respective heirs, legal representatives, successors, or assigns. The parties also agree that the terms used in this Agreement should be construed in accordance with their ordinary meaning and that they shall not be construed for or against either party.

13.   Partial Invalidity

The parties agree that the provisions of this Agreement shall be deemed severable and that the invalidity or unenforceability of any portion or any provision shall not affect the validity or enforceability of the other portions or provisions. Such provisions shall be appropriately limited and given effect to the extent that they may be enforceable. The parties further agree that no failure by any party to insist on strict performance of this Agreement in any instance will be deemed a waiver or relinquishment of its right to seek strict performance and the Agreement will continue in full force and effect.

14.   Headings

The headings or titles of sections of this Agreement are for convenience and reference only and do not constitute a part of this Agreement.

15.   **ACKNOWLEDGMENT OF UNDERSTANDING**

EMPLOYEE ACKNOWLEDGES THAT EMPLOYER HAS ADVISED EMPLOYEE TO SEEK THE ADVICE OF LEGAL COUNSEL AND EMPLOYEE HAS HAD AN OPPORTUNITY TO DO SO PRIOR TO EXECUTING THIS AGREEMENT. EMPLOYEE AFFIRMS THAT EMPLOYEE HAS CAREFULLY READ THIS ENTIRE AGREEMENT AND FULLY UNDERSTANDS EACH OF ITS PROVISIONS. EMPLOYEE FURTHER ACKNOWLEDGES THAT EMPLOYER HAS PROVIDED EMPLOYEE THE OPPORTUNITY TO CONSIDER THIS AGREEMENT FOR A PERIOD OF FORTY FIVE (45) DAYS.

16.   REVOCATION

EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT MAY BE REVOKED BY EMPLOYEE WITHIN SEVEN (7) DAYS AFTER EMPLOYEE SIGNS THE AGREEMENT. To revoke the Agreement, Employee understands that Employee must provide written notice of revocation to Dixie Scott-Marshall, HR Manager - US, 4700 Daybreak Parkway, South Jordan, UT, 84009 or by email at Dixie.Scott-Marshall@riotinto.com. For revocation to be effective, Dixie Scott-Marshall must receive written notice by telecopy or other delivery before 5:00 p.m. on the seventh (7th) calendar day after the day Employee executes this Agreement. This Agreement shall be final and binding on the eighth (8th) day after it has been executed and delivered to Employer.

17. AFFIRMATION OF COMPETENCY AND WILLFULLNESS

EMPLOYEE AFFIRMS THAT EMPLOYEE IS FULLY COMPETENT TO EXECUTE THIS
AGREEMENT AND THAT EMPLOYEE DOES SO VOLUNTARILY, OF EMPLOYEE'S OWN FREE
WILL, AND WITHOUT ANY COERCION, UNDUE INFLUENCE, THREAT, OR INTIMIDATION OF
ANY KIND.

18. Individuals Covered By The Severance Benefits Offer

Attached hereto as Attachment "A" is a document containing the following information, which you
acknowledge you received at the time you were first given this Agreement to consider:

    a.    the group of individuals covered by the severance benefit offer;

    b.    the eligibility factors for the severance benefit offer;

    c.    the time limits applicable to the severance benefit offer;

    d.    the job titles and ages of all individuals eligible for the severance benefit offer;

    e.    the job title and ages of all individuals in the same job classification or organizational
       unit who are not eligible for the severance benefit offer.

IN WITNESS WHEREOF, the parties execute this Agreement on the day and year written above.

AS TO EMPLOYEE:


_____      Date: _1/2/19_____
Mark Zanek

AS TO EMPLOYER:


_____
Dixie Scott-Marshall

HR Manager - US